UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

NASEER NASSER, M.D.,

        Plaintiff,

v.                                   CAUSE NO. 3:23-CV-506 DRL-MGG

THE SOUTH BEND CLINIC, LLC and
KELLY MACKEN-MARBLE,

        Defendants.

## OPINION AND ORDER

While he was a partner at the South Bend Clinic, LLP,[1] Dr. Naseer Nasser had extensive disagreements with South Bend Clinic management, including CEO Kelly Macken-Marble, regarding the company's transparency and finances. Ms. Macken-Marble and other executives asked him to resign or they would proceed to a partnership vote on his termination. He resigned. He sues SBC and its CEO for discrimination under 42 U.S.C. § 1981, with certain additional state law claims for breach of fiduciary duties and publicity standards against SBC only. The defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). The court grants the motion in part.

## BACKGROUND

Accepting all well-pleaded allegations as true and taking all reasonable inferences in Dr. Nasser's favor, these facts emerge for today's purposes. Dr. Nasser, an Iraqi-born dual citizen of Arab ethnicity and race [1 ¶¶ 7, 59], is a cardiology specialist in South Bend, Indiana with over 29 years of experience in cardiovascular disease, internal medicine, and interventional cardiology [*id.* ¶ 19]. From September 2007 to September 2021, Dr. Nasser was a partner practicing medicine at SBC [*id.* ¶ 20]. He resigned on September 1, 2021 [*id.* ¶ 21].

---

[1] SBC is now an LLC [*see* 9 at 1].

In 2020, Dr. Nasser signed an agreement entitled "2020 Second Amended Restated Partnership Agreement of the South Bend Clinic, LLP" [*id.* ¶ 21; Agreement (*id.* 25)]. The Agreement included a non-competition clause for departing partners [*id.* ¶ 22; Agreement § 27(b) (*id.* 37)]. The Agreement also included a liquidated damages clause for violation of the non-competition obligations [Agreement § 27(e) (*id.* 39)]. The Agreement established a mechanism to seek a waiver of the non-competition and liquidated damages provisions upon the written request of a partner if at least two-thirds of the remaining partners so agreed [Agreement § 27(h) (*id.* 42)].

Dr. Nasser held a spotless record at SBC and served on the board of trustees there and on the board of managers at Unity Physicians Hospital during his final year as partner [*id.* ¶¶ 32-34]. Early during his tenure as a member of the boards, Dr. Nasser questioned the lack of transparent communication and financial irregularities concerning administrative leaders Kelly Macken-Marble, the chief executive officer of both SBC and UPH, and Lisa Wine, the chief financial officer of SBC [*id.* ¶ 35]. He says he witnessed "unjust treatment" of a former CFO of UPH, Jose Diaz De Leon [*id.* ¶¶ 36-37]. He alleges Mr. De Leon tried to bring hidden irregularities in operation and financial reporting to UPH's owners and partners but was told not to fix anything [*id.* ¶ 37]. Mr. De Leon was fired [*id.* ¶ 36].

Dr. Nasser raised what he calls "blatant" inconsistencies between SBC's year-end financial statements provided by Ms. Wine and the audited statements provided by accounting firm Crowe LLP over a span of several consecutive years [*id.* ¶ 38]. For example, there was an unexplained $7 million variance in "net cash from investing activities" between the two documents in 2019 [*id.* ¶ 38]. When Dr. Nasser shared these concerns with Ms. Macken-Marble, she responded a few minutes later by text that she could "see how Crowe reassigned the liabilities" [*id.* ¶ 39]. Dr. Nasser requested further explanation, but she never provided further explanation [*id.* ¶ 39].

Dr. Nasser also raised concerns about the accounting methods used for SBC's cardiology department [*id.* ¶ 40]. Another partner, Dr. Rickyn Patel, reportedly found material accounting errors by

Ms. Wine [*id.* ¶ 40]. According to the complaint, the SBC administrative team asked Dr. Patel to keep silent [*id.* ¶ 40]. In a meeting with Dr. Patel and SBC executives, including Ms. Macken-Marble, Ms. Wine, President Bradly Scott, and Vice President Daniel Brier, the finance chair, the department chair, and other cardiology partners, the executives admitted to the accounting errors [*id.* ¶ 40].

Dr. Nasser raised a concern about cardiology billing—also discovered by Dr. Patel—that services provided by one physician were submitted under the name of another physician [*id.* ¶ 41]. Dr. Nasser alone had more than $1,000,000 in missing charges [*id.* ¶ 42]. Though Dr. Nasser requested a meeting, no resolution was relayed to Dr. Nasser [*id.* ¶ 41]. That said, as the billing team worked on this issue, nineteen members of the business office were suddenly sent home or terminated [*id.* ¶ 42].

Dr. Nasser alleges that SBC's executive team has for years incorrectly reported cardiology financial statements by intentionally omitting revenue generated, which led to a portrayed loss in cardiology despite the department being one of SBC's most profitable [*id.* ¶ 43]. This led to the cardiology partners having a false negative net income, a portrayed narrative that the cardiology partners were subsidized by other SBC partners, a compensation for the cardiology partners 30-40 percent below the national average, and a deprivation of proceeds from the Real Estate Equity Plan as to the cardiologists—proceeds that the rest of the partners enjoyed [*id.* ¶ 43].

Dr. Nasser raised these concerns to Ms. Macken-Marble, several other SBC executives, and two other cardiology partners in a meeting on December 15, 2020 [*id.* ¶ 44]. At this meeting, Ms. Wine admitted that she was new to the job and was following orders to conduct her accounting a certain way [*id.*]. Ms. Macken-Marble acknowledged wrongdoing and agreed to write a letter to the partnership addressing the issue, though she never did [*id.*]. The vice president apologized to the cardiologists on behalf of the administrative team [*id.*].

In 2021, SBC merged with Allied Physicians of Mishawaka (APOM) [*id.* ¶ 45]. Before the merger, Dr. Nasser sent questions about the transaction to the CFO [*id.* ¶ 45]. He says he received vague answers

3

to some but not all of his questions [*id.* ¶ 45]. At Dr. Nasser's persistence, Ms. Macken-Marble set up a virtual meeting on February 17, 2021, attended by the CFO, president, and vice president as well [*id.* ¶ 45]. Dr. Nasser again expressed his concerns about transparency and financial irregularities [*id.* ¶ 45]. The vice president said that "no one wants to retire in SBC, everyone is aware of these financial decisions, and everyone wants to cash out" [*id.* ¶ 45]. Dr. Nasser challenged the administrative team's misleading of the partnership [*id.* ¶ 45].

Ms. Macken-Marble asked Dr. Nasser to meet with her after this meeting [*id.* ¶ 46]. She denied that the vice president had said everyone wanted to cash out, and she said that Dr. Nasser was perceived to be a bully [*id.* ¶ 46]. When he asked her whom he was bullying, she said, "I am sharing that there is a sense of it" [*id.* ¶ 46].

After raising these concerns, Dr. Nasser voluntarily stepped down from the SBC board of trustees in early 2021 [*id.* ¶ 47]. Shortly after his resignation from SBC's board, Dr. Nasser requested financial information from SBC's finance department [*id.* ¶ 47]. His request was denied; and Dr. Brian Carter, the Chair of the Quality Physician's Committee (QIPRCC), demanded that Dr. Nasser refrain from asking financial questions until after a follow-up meeting three weeks later [*id.* ¶ 47]. Dr. Nasser's request for an earlier meeting was denied [*id.* ¶ 47].

At the meeting, QIPRCC relayed that it was told that Dr. Nasser had issues with former SBC administration regarding the cardiology department and that Dr. Nasser couldn't get over it [*id.* ¶ 48]. Dr. Nasser raised his financial and transparency concerns again [*id.* ¶ 48]. QIPRCC asserted that it needed an independent third-party to examine SBC's financials and address Dr. Nasser's concerns, which Dr. Nasser says never happened [*id.* ¶ 49]. The committee asked Dr. Nasser to present his financial analysis to SBC's finance committee, and the QIPRCC scheduled a follow-up meeting a month later [*id.* ¶ 49].

After this meeting, he says Ms. Macken-Marble spread rumors throughout the administrative team that Dr. Nasser was behind a new cardiologist's decision to withdraw from joining SBC [*id.* ¶ 50].

4

She also asked two employees in the cardiology department whether they had heard that Dr. Nasser was leaving SBC [*id.* ¶ 50]. Ms. Macken-Marble insinuated she heard it from a patient [*id.* ¶ 50]. Dr. Nasser contacted this patient, and the patient told him she never heard him say that [*id.* ¶ 51].

Ms. Macken-Marble invited Dr. Nasser to meet with the president and QIPRCC chair [*id.* ¶ 52]. Though labeled a "QIPRCC follow up meeting" by email beforehand, the meeting held a different tone [*id.* ¶¶ 52-53]. Dr. Nasser was informed that the board was frustrated with him and demanded his resignation from the partnership, threatening a partnership vote otherwise [¶ 53]. Dr. Nasser, "[b]lind-sided" and "terrified of the toxic environment that had been created around him by the CEO (Macken-Marble) and the President of the board," requested a few days to get back with them [*id.* ¶ 53].

Dr. Nasser's email was immediately deactivated, preventing him from working, though Ms. Macken-Markle, realizing "she committed a mistake," directed IT to reactivate his credentials on the same day [*id.* ¶ 54]. Dr. Nasser believes this was a sign that "a de facto termination of Dr. Nasser's partner status, without a partner vote, had occurred" [*id.* ¶ 54].

Dr. Nasser contacted two physicians on QIPRCC after the meeting and asked them if the committee had recommended his resignation [*id.* ¶ 55]. They told him that no such thing was discussed and that the committee had no issues with his questions [*id.* ¶ 55]. Rather, in his view, "the President, QIPRCC chair, and the CEO (Kelly Macken-Marble) unilaterally coerced Dr. Nasser to resign, without any discussion or input from the QIPRCC or other partners of SBC" [*id.* ¶ 55]. Dr. Nasser resigned thereafter [*id.* ¶ 72]. He estimates losing $511,000 in a lost payout and $1,000,000 in income plus benefits due to his resignation [*id.* ¶¶ 74-75]. He also alleges that SBC mismanaged his K1 in 2020 [*id.* ¶ 56].

Throughout his tenure at SBC, Dr. Nasser alleges that he witnessed white male partners break partnership rules by being intoxicated at work and by verbally abusing staff, and Ms. Macken-Marble, the QIPRCC, and the board were aware [*id.* ¶ 60]. None of these partners were asked to resign [*id.* ¶ 60].

SBC refused to waive Dr. Nasser's non-competition obligations under § 27(b) of the Agreement [*id.* ¶ 24]. He has since served as a traveling physician throughout the United States [*id.* ¶ 23]. Dr. Zuhair Yaseen, of Arab ethnicity and race [*id.* ¶ 9], and Dr. Luis Nidea, of Asian ethnicity and race [*id.* ¶ 11], made liquidated damages payments, and SBC waived their non-compete obligations [*id.* ¶ 29]. Dr. Nasser alleges that SBC waived the non-competition and liquidated damages requirements for physicians outside Dr. Nasser's protected race and ethnicity, including Dr. Gregory Credi [*id.* ¶ 24].

After Dr. Nasser left SBC, SBC used his name without his authorization [*id.* ¶ 96]. SBC kept him listed as an owner of the SBC surgery center on its website [*id.* ¶ 98]. Dr. Nasser additionally alleges that SBC breached its fiduciary duties in the following ways related to the APOM sale: making a last-minute change in the compensation model linked to the sale [*id.* ¶ 86(a)]; eliminating the 18-month grace period agreed on after a June 8, 2021 vote [*id.* ¶ 87(b)]; manipulating ASC profit sharing [*id.* ¶ 87(c)]; failing to disclose financials and disguise information throughout the sale of assets [*id.* ¶ 87(d)]; manipulating the timelines of the steps required for the sale to SBC's and Ms. Macken-Marble's advantage [*id.* ¶ 87(e)]; and denying information until after votes took place [*id.* ¶ 87(f)].

## STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It need not plead "detailed factual allegations." *Id.* A claim must be plausible, not probable. *Indep. Tr. Corp. v. Steward Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a claim is sufficiently plausible to survive a motion to dismiss is "'a context-specific task that requires the reviewing court to draw on its

6

judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quotations and citation omitted).

Generally, if a party attaches evidence outside the pleadings in a motion to dismiss, "the court must either convert [the motion] into a motion for summary judgment under Rule 56 . . . or exclude the documents attached to the motion to dismiss and continue under Rule 12." *188 LLC v. Trinity Indus. Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (citation omitted). There is a narrow exception: a dismissal motion can rest on critical documents, central to the claim and referred to in the complaint. *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *188 LLC*, 300 F.3d at 735.

DISCUSSION

A.  *Section 1981 Discrimination.*

Dr. Nasser advances a § 1981 discrimination claim against Ms. Macken-Marble and SBC. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). A claim exists against private employers, *see Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 670-71 (7th Cir. 2014), and individuals in the employment context, *see Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.* 69 F.4th 437, 453 n.9 (7th Cir. 2023).

"To establish a prima facie claim of [§ 1981] discrimination, [the plaintiff] must show that (1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). The court evaluates a § 1981 claim the same way retaliation or

7

discrimination claims are evaluated under other labor statutes. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002). The law asks whether "the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367-68 (7th Cir. 2019). The plaintiff must "initially plead and ultimately prove that, but for race, he would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Discrimination can be shown holistically or through the traditional burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *Ortiz*, 834 F.3d at 761, 765.

General allegations that the defendant "knew about" the plaintiff's race or was "motivated by discrimination" are not enough to sustain a claim under § 1981. *Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. Appx. 347, 350 (7th Cir. 2021). The plaintiff must plead facts permitting a plausible inference of but-for causation. *Id.* The plaintiff may demonstrate discriminatory intent from allegations that discriminatory comments were made by the defendant, *see Swanson v. Citibank, N.A.*, 614 F.3d 400, 402-03 (7th Cir. 2010), or that he was treated differently than those of another race similarly situated to the plaintiff who engaged in similar conduct, *see Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

Dr. Nasser alleges what are in truth two § 1981 claims. *See AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). First, he claims that he was constructively discharged. Second, he alleges that SBC and Ms. Macken-Marble discriminated against him by refusing to waive his non-competition obligations as had been done for individuals outside his protected class.

"Constructive discharge, like actual discharge, is a materially adverse employment action. But to demonstrate constructive discharge, the plaintiff must show that [he] was forced to resign because [his] working conditions, from the standpoint of the reasonable employee, had become unbearable." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002) (citation omitted). These are "working conditions even more egregious than that required for a hostile work environment claim." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023); *see Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (citation omitted) ("[A]lthough a workplace need not be 'hellish' to constitute a hostile work environment, a hostile work environment must be 'so pervaded by discrimination that the terms and conditions of employment [a]re altered.'"). "In other words, the plaintiff's resignation is not truly voluntary if quitting was the only way [he] could extricate h[im]self from the intolerable conditions." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

A plaintiff may also bring a constructive discharge claim when "an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated, and the plaintiff employee resigns." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010). That said, "the prospect of being fired at the conclusion of an extended process, without more, does not" qualify as constructive discharge. *Id.* (quotations omitted). "The test is not whether the employee who resigned was happy about resigning or even whether the employer asked for the resignation." *Ulrey v. Reichhart*, 941 F.3d 255, 262 (7th Cir. 2019). "[E]mployees are generally expected to remain employed while seeking redress." *Wince*, 66 F.4th at 1043.

Mr. Nasser argues that SBC had already decided to terminate him because his computer was shut off for a day—meaning to him the partnership vote was a "sham procedure." He contends that white employees had engaged in misconduct without being asked to resign, yet he was asked to resign when he merely raised questions about SBC's business conduct. The defense argues that Dr. Nasser's resignation is fatal to his claim and that he hasn't otherwise alleged intolerable conditions.

9

Even taking every reasonable inference in Dr. Nasser's favor, his allegations don't plausibly state a constructive discharge claim. He claims that Ms. Macken-Marble and the president informed him that the SBC board demanded his resignation, or they would call a partnership vote. He says Ms. Macken-Marble, the president, and the QIPRCC chair had already made up their minds to terminate him without a partnership vote, evinced by the immediate deactivation of his computer [*id.* ¶ 54]. He also alleges that Ms. Macken-Marble realized she committed a mistake and directed IT personnel to reactivate his credentials that same day.

But there is no certainty how the partnership might have voted. The partnership was never put to that task. Nor is it plausible to infer that the partners had already made up their mind simply through the actions of Ms. Macken-Marble—particularly when she reactivated his credentials the same day as the mistake was discovered. To that point, two physicians on the QIPRCC said the committee never discussed recommending his resignation and believed the committee had no issues with Mr. Nasser's questions about financial information. Indeed, Dr. Nasser alleges that "the President, QIPRCC chair, and the CEO (Kelly Macken-Marble) unilaterally coerced [him] to resign without any discussion or input from the QIPRCC or other partners of SBC" [*id.*]. Dr. Nasser still had an opportunity to stave off a termination—his right under the partnership agreement [Agreement § 29 (*id.* 43)]. By his own allegations, quitting was far from his only option, *see Swearnigen-El*, 602 F.3d at 859, and he has not plausibly alleged conditions so intolerable that a reasonable person would have felt compelled to resign, *see EEOC*, 276 F.3d at 331. Dr. Nasser's constructive discharge claim, as a separate actionable claim, cannot proceed. *See AMTRAK*, 536 U.S. at 114; *cf. Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021).

For employment discrimination, a "similarly situated" showing requires that the employees "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quotations omitted).

But "[t]o survive . . . a motion to dismiss, a plaintiff need only allege enough facts to allow for a *plausible* inference that the adverse action suffered was connected to [his] protected characteristics." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022). The plaintiff "certainly does not need to identify . . . a similarly situated employee who managed to avoid" the adverse employment action. *Id.*

Dr. Nasser alleges that SBC and Ms. Macken-Marble discriminated against him in the enforcement of his contractual rights by waiving the non-competition obligations for an individual outside his protected class, Dr. Credi, while refusing to waive his. The defense argues that there are no allegations that Ms. Macken-Marble or anyone at SBC made any discriminatory comments regarding the non-competition obligations, and Dr. Nasser has not sufficiently alleged that Dr. Credi is similarly situated. Specific allegations of similarly situated employees are not necessary to survive a motion to dismiss. *Kaminski*, 23 F.4th at 777. Now isn't the time to prove similar situations, but to allege it plausibly. At the pleading stage, the allegation that someone outside Dr. Nasser's protected class has had the same contractual obligations waived is enough.

The defense also argues that there is an obvious, alternative explanation for the decision to enforce the non-competition and liquidated damage provisions against Dr. Nasser—he spent years in disagreement with SBC and Ms. Macken-Marble over the accessibility of financial records. "[A]n obvious alternative explanation for a defendant's conduct that precludes liability can undermine the claim's plausibility." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 629 (7th Cir. 2023). "[W]hether a claim survives dismissal necessarily depends on the strength or obviousness of the alternative explanation that the defendant provides." *Id.* "Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss." *Id.*

It is reasonable to infer but-for discrimination based on Dr. Nasser's allegations that only white doctors had their obligations waived while Dr. Nasser and others in a protected class didn't. He offers a comparator. He pleaded that race was the only difference between him and the partner who had his non-

11

competition obligations waived without making liquidated damage payments. SBC marshals the allegations about the ongoing dissatisfaction and inquiries about transparency and financial irregularities, suggesting that this recounted history shows SBC was justified to force a resignation of a difficult partner; but the court must construe these allegations in the light most favorable to Dr. Nasser at this stage. Doing so offers a plausible theory that supports his claim. Dr. Nasser's § 1981 claim based on the non-competition clause may proceed given that, on this record of the pleading only and taking all reasonable inferences in his favor, the presence of a reasonable alternative explanation stands as equally plausible to the allegation that discrimination in contract enforcement occurred.

B.  *Breach of Fiduciary Duties.*

Dr. Nasser says SBC violated its fiduciary duty. For such a claim, Dr. Nasser must prove: "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015). "Under common law, general partners owe each other and the partnership fiduciary duties until final termination of the partnership." *In re Rueth Dev. Co.*, 976 N.E.2d 42, 53 (Ind. Ct. App. 2012). "This fiduciary relationship between partners requires each partner to exercise good faith and fair dealing in partnership transactions and toward co-partners." *Id.* Partners must refrain from taking any personal advantage concerning the business aspects or property of the partnership. *Lawlis v. Kightlinger & Gray*, 562 N.E.2d 435, 442 (Ind. Ct. App. 1990).

Dr. Nasser cites several bases for his fiduciary duty claim, including the lack of transparency, financial issues, and discriminatory actions [*see* 1 ¶¶ 80-92]. SBC argues that Dr. Nasser has not alleged that any specific partners breached any fiduciary duties. To the contrary, Dr. Nasser says "partners other than Dr. Nasser, Dr. Yaseen, and Dr. Nidea breached their fiduciary duty to Dr. Nasser" [1 ¶ 91]. He thus lays the alleged actions at the feet of the remaining partners (save two). Whether discovery may bear out this claim isn't the question today, for the court must take his allegations as true.

SBC argues that the complaint alleges only conduct by the SBC executives, not the partners. True, the complaint contains allegations about the actions of SBC's executives; but Dr. Nasser attributes these actions to the partners as well. Whether the law would absolve the partnership of liability for the actions of the partnership's executives, and SBC offers no law on this subject, *see* J. William Callison and Maureen A. Sullivan, *Partnership Law & Practice* § 12:2 (2023-2024) ("Partners have a duty to use appropriate care in managing the partnership business, and they can be held accountable for poor business management which violates the requisite duty."), the court cannot dismiss a claim when at least one plausible theory of liability might prevail, *see Bilek*, 8 F.4th at 587. The court thus denies the motion to dismiss the fiduciary duty claim.

    C. *Right of Publicity.*

Dr. Nasser alleges that SBC misappropriated his personality. Indiana law recognizes, as part of a right of publicity, a property interest in one's personality—name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms. Ind. Code § 32-36-1-7. A "personality" is a "living or deceased natural person" whose interest in one of these items "has commercial value, whether or not the person uses or authorizes the use of the person's rights of publicity for a commercial purpose during the person's lifetime." Ind. Code § 32-36-1-6. A personality's name may not be used without authorization for a "commercial purpose," defined as use (1) "[o]n or in connection with a product, merchandise, goods, services, or commercial activities," (2) "[f]or advertising or soliciting purchases of products, merchandise, goods, services, or for promoting commercial activities," or (3) "[f]or the purpose of fundraising." Ind. Code § 32-36-1-2. A harmed plaintiff can recover $1,000 or actual damages, whichever is greater, as well as treble or punitive damages for knowing, willful, or intentional violations. Ind. Code § 32-36-1-10.

SBC raises a threshold question of standing—and, in doing so, frankly pivots from its original Rule 12(b)(6) motion because Article III standing concerns the very power of the court to entertain the

13

suit. *See Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021); *see also* Fed. R. Civ. P. 12(b)(1); *Choice v. Kohn Law Firm*, 77 F.4th 636, 638 (7th Cir. 2023) (the court "construe[s] the defendants' challenges under Federal Rule of Civil Procedure 12(b)(1) as facial attacks on the complaint, contesting whether the allegations, taken as true, support standing"). The United States Constitution confines the federal judiciary's power to "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, a plaintiff must have standing—an injury, fairly traceable to the defendant's conduct, that the court's decision will likely redress. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). Standing is not "dispensed in gross," so a plaintiff "must demonstrate standing for each claim [he presses] and for each form of relief [he seeks]." *TransUnion*, 141 S. Ct. at 2208.

A plaintiff must allege an injury both "concrete *and* particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion*, 141 S. Ct. at 2203 (citation and quotations omitted). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 n.1 (1992). "Concrete" means the injury must be "real," though not necessarily "tangible." *Spokeo*, 578 U.S. at 340.

A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341. "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* But "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Id.* at 342. For example, a violation of the Fair Credit Reporting Act of 1970 could result in harm to certain plaintiffs upon the dissemination of credit reports labeling them as potential terrorists, drug traffickers, or serious criminals, *see TransUnion*, 141 S. Ct. at 2209, but it would

14

be "difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm," *Spokeo*, 578 U.S. at 342.

"Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including . . . reputational harm." *TransUnion*, 141 S. Ct. at 2200, 2209 (publishing of credit reports that labeled the class members as potential terrorists, drug traffickers, or serious criminals was reputational harm); *see also Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022) (reputational harm is a real-world injury and sufficiently concrete; no downstream injuries need be demonstrated). A close relationship need not be an "exact duplicate." *TransUnion*, 141 S. Ct. at 2209.

Indiana's right to publicity statute largely codifies the common law right to publicity. *See Daniels v. FanDuel, Inc.*, 109 N.E.3d 390, 394-95 (Ind. 2018). "At common law, the misappropriation of [a] person's likeness is an injury to the right of publicity in itself" for purposes of satisfying standing. *Fry v. Ancestry.com Operations Inc.*, 2023 U.S. Dist. LEXIS 50330, 12 (N.D. Ind. Mar. 24, 2023); *see* Restatement (Second) of Torts § 652C (1997) ("One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."). "[T]he statutory injury has a basis in the common law and alleging a violation of the statute would be sufficiently concrete to give rise to Article III standing." *Fry*, 2023 U.S. Dist. LEXIS at 12.

Dr. Nasser alleges that SBC listed his name as an owner of the South Bend Clinic on its website after he left. SBC argues that Dr. Nasser has not shown a concrete injury sufficient for Article III standing because there was only a procedural violation of an Indiana statute. SBC cites *Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1241 (Ind. 2023), which required a concrete injury beyond a bare procedural violation of the Indiana Deceptive Consumer Sales Act. Here, at this stage for the right to publicity, the allegation of SBC's unauthorized use of his name for a commercial purpose meets Article III's injury

15

requirement. *See TransUnion*, 141 S. Ct. at 2200. The right to publicity concerns not just the bare procedural violation of a published zip code, but the unauthorized commercial use of someone's name, more akin to a reputation harm.

SBC also argues that Dr. Nasser doesn't allege that anyone accessed SBC's website and saw his name listed among the other owners. Indeed, the complaint is devoid of any such allegation, and Dr. Nasser doesn't respond to this argument. But the statute requires use for a commercial purpose, *see* Ind. Code § 32-36-1-2, and there is a plausible inference that Dr. Nasser's name was used for a commercial purpose when it was displayed on a public website for a well-known medical clinic consisting of some 100 or more physicians. The inference need not be probable, just plausible. *See Indep.*, 665 F.3d at 935. And discovery will bear out whether any such use occurred. This issue survives the pleading stage, though the obligation to prove an inappropriate use remains with Dr. Nasser.

SBC also argues that the use of Dr. Nasser's name falls under the "public interest" and "newsworthy" exceptions to Indiana's right to publicity statute. *See* Ind. Code §§ 32-36-1-1(c)(3), (c)(1)(B). SBC says it is required by law to disclose ownership interests. The complaint alleges that these exceptions don't apply; and, more than allege this conclusion, explains plausibly that SBC nonetheless continued to list him as an owner after his departure. Query whether his resignation also terminated his ownership status immediately upon his departure, but SBC hasn't argued this point. For the same reason, the court cannot on the pleading alone dismiss the request for exemplary damages because the complaint alleges SBC's willfulness based on its knowledge of its owners, knowledge and control over its website, and its decision not to remove Dr. Nasser from the website after his departure. Discovery may establish that this was mere oversight, not willful or intentional, but the court must accept today's allegations as true. The right to publicity claim may proceed.

CONCLUSION

Accordingly, the court GRANTS IN PART the motion to dismiss [8] and DISMISSES his § 1981 claim based on constructive discharge. The § 1981 discrimination claim based on the non-competition agreement, the breach of fiduciary duty claim, and right of publicity claim proceed.

SO ORDERED.

March 5, 2024   *s/ Damon R. Leichty*
                Judge, United States District Court